Filed 1/26/24  P. v. Underwood CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TYLER UNDERWOOD,<br><br>        Defendant and Appellant. | A165026<br><br>(Alameda County<br>Super. Ct. No. 18-CR-018052) |

Tyler Underwood appeals from convictions of murder and multiple other offenses after he lost control of the car he was driving while under the influence of alcohol and, in the resulting collision, one passenger was killed and others injured.  Underwood believes he was guilty of at most gross vehicular manslaughter or involuntary manslaughter and challenges several rulings preventing him from presenting the jury with these alternative offenses.  Additionally, he contends certain sentence enhancements were not authorized by statute and must be stricken.  We agree with the latter argument and otherwise affirm the judgment.

# BACKGROUND

## I.

### *Factual Background*

#### A. The Collision

On the evening of October 9, 2018, Underwood was with Wint Kyaw, Chris Stubbs, Darren Walker, Ron Mauck and Sean Johnson, talking and drinking in the parking lot of the Fanwood Terrace apartment complex in Fremont. Underwood's four-year-old daughter, Jane Doe, was with him; Underwood had recently won full custody of her. After an hour or two, Underwood, Doe and Kyaw drove to McDonald's, bought more beer and returned to the apartments. A short time later, they went to the house where Underwood was living, a few minutes drive away. Outside the house, Underwood, Kyaw, Walker and others including Daniel Cameron and Blake Blevins, continued drinking and talking.

Johnson testified that he left the group at the apartments after getting into an argument with Underwood when Johnson said Underwood should not be drinking and driving with his daughter in the car. Johnson could tell when Underwood was impaired and he was not showing signs of being intoxicated, but Johnson thought it was wrong to be drinking and driving with your child in the car. He believed Underwood had a high tolerance for alcohol and did not think beer "really affects" him. Johnson testified that Underwood had "at least two" beers but acknowledged having told the defense investigator that Underwood had "one to two" tall cans.

Kyaw testified that she drank three tall (24 ounce) cans of Mickey's beer and saw Underwood drinking Mickey's tall cans. Before they left the apartments to go to Underwood's house, Stubbs asked Underwood if he was "okay to drive" and said he should not drive with his daughter. Underwood

2

said he was fine and "[i]t's just beer.  It's just water."  At Underwood's house, Kyaw saw Underwood drink "[m]aybe . . . two" Mickey's cans and a shot of Fireball whiskey, then acknowledged on cross examination that she did not actually remember whether he drank any Fireball.  Cameron testified that Underwood drank at least two tall cans of beer, but he did not remember exactly how much.

The group decided to get food from a restaurant in Milpitas.  Blevins drove one car, with Cameron as a passenger, and Underwood drove the other, with Kyaw, Walker and Underwood's daughter as passengers.  Kyaw testified that she knew Underwood was intoxicated because he had had "too many beers," he was stumbling and his face was red.  She offered to drive but he said he was okay, and she believed him.  Blevins testified that Underwood did not show any signs of being impaired by alcohol.  Cameron testified that he was intoxicated and believed Underwood was too, and that from his experience drinking with Underwood, Underwood drank "to actually get drunk."

Kyaw sat in the front seat of Underwood's BMW, with Doe behind her and Walker behind Underwood.  They stopped at a gas station a few minutes from Underwood's house.  After watching a clip from the surveillance video showing Underwood filling the tank and walking around, Kyaw testified that he appeared to be intoxicated because he was stumbling.

After getting gas, Underwood got on the freeway, driving about 80 miles per hour.  Blevins's car was behind them, and then passed them going at what Kyaw believed was around 100 miles per hour.  Underwood caught up with Blevins and the two cars raced.  Kyaw did not feel safe because Underwood was "driving and drinking."  She felt like he was driving faster and faster and when she looked at the speedometer, it said 140 miles per

3

hour.  The car started to swerve, Kyaw thought she heard a tire pop, and she could feel the bumps of the lane dividers as the car moved to the right.  She and Walker had both told Underwood to slow down and he did, but the car was already out of control.

The car flipped over a "cliff" and rolled three or four times.  Kyaw hit her head and briefly lost consciousness, then came to and heard Doe crying.  Kyaw's head and ankle were bleeding.  She wanted to get Doe out of the car, which was smoking, and she climbed out the window because the car door would not open.  Cameron and Blevins helped get Doe out.  Kyaw testified that as she walked up the hill with Underwood, he told everyone that he was not driving, Cameron was, and asked Kyaw, Cameron and Blevins to lie to the police about who was driving.  Everyone agreed; Kyaw testified that she did so because she was in shock.  She told California Highway Patrol (CHP) officers that Cameron had been driving, which was not true.  Kyaw had an immunity agreement providing that her testimony could not be used against her.

Blevins testified that as he was driving on the freeway at about 75 miles per hour with Underwood behind him, Underwood passed him on the left, going about 100 miles per hour, and they jokingly threw hand signals at each other.  Underwood had told him his car could go 140 miles per hour. As the gap between the cars grew, Blevins commented to Cameron that Underwood needed to slow down because it was reckless to drive as fast as he was driving.  Blevins then suddenly saw Underwood's taillights "starting to go sideways" and realized Underwood had lost control of the car, which veered across the freeway to the right.  Cameron estimated that Underwood was driving at least 90 miles per hour when he passed their car.  He did not feel like the cars were "interacting or racing."  He testified that Underwood

4

"hit a bump or something" and the car veered right and went down the embankment.

Blevins pulled over and both he and Cameron ran down the embankment. Underwood's car was behind or against a tree and Doe and Kyaw were screaming. Underwood was standing outside the car, by the driver's door according to Cameron and near the right-side passenger door according to Blevins. Blevins and Cameron helped Doe out of her car seat. Underwood asked Cameron to "take the fall" for him, saying he could not "get another DUI" (Driving Under the Influence) and he would owe Cameron his life. Cameron did not immediately reply.

Once they were back at the top of the hill, Cameron saw the police coming and realized he had to answer Underwood. Cameron asked Underwood, Kyaw and Blevins, " 'who was driving?' "; when Kyaw said Underwood, Cameron said, "no, I was." Cameron testified that he was thinking he would "get a DUI" and "maybe sit in the jail for a day" but "just get out . . . pretty soon." Asked why he was willing to be arrested for Underwood, Cameron testified that he thought about Underwood having just gotten custody of Doe and that he was always trying to help people.

Blevins testified that Underwood told him Cameron was going to "take the fall" for the accident and at first Blevins said he "wasn't okay with that," then he agreed when Cameron told him it was alright. When the police arrived, both Cameron and Blevins told them Cameron was driving.

## B. Emergency Responders' Observations

When CHP Officer Logan Dysert arrived at the scene, Cameron and Kyaw each separately told him Cameron was the driver. Both had red,

5

watery eyes and Kyaw had the odor of alcohol on her breath.[1] Underwood said the car was his, but Cameron was the driver. Underwood, too, had red, watery eyes, as well as a strong odor of alcohol on his breath and slurred speech. Underwood answered Dysert's questions very quickly, "like he wanted to get out of there," but he was cooperative, coherent and followed Dysert's directions. Dysert believed Underwood, Cameron and Kyaw were all under the influence of alcohol. He conducted field sobriety tests with Cameron, who did poorly, and placed him under arrest.

Several of the first responders at the scene testified, based on their training and experience, that Underwood appeared to be intoxicated. Paramedic David Eastin testified that Underwood was "very loud, very belligerent" and did not appear to be cooperating appropriately with emergency responders given the severity of the accident. At one point Underwood appeared to lose his balance and "sidestepp[ed] into the freeway" and someone grabbed him. Eastin testified that it was "apparent that there was some substance on board." Firefighter and paramedic Frank Carlucci testified that Underwood was "very aggressive," "belligerent" and "all over the place," "mak[ing] the scene very difficult to control"; "his hands were on everybody," he was not listening to what the paramedics were trying to tell him and he did not appear to comprehend what Carlucci said to him. Carlucci smelled alcohol on Underwood from a foot away. Fremont Fire Department Captain and emergency medical technician Ronald Martin described Underwood's behavior as "erratic to the point where it was making things very hard to assess our patients" and the responders "were worried

---

[1] Dysert acknowledged that red, watery eyes can result from an airbag deploying in a person's face.

about his safety." Underwood was moving a lot and yelling, and there was concern that he was going to walk into traffic. Martin thought Underwood was intoxicated based on his "loud, slurred speech" and "belligerence," and thought he smelled alcohol on Underwood. Underwood was very concerned about his daughter, but in Martin's experience his behavior "felt excessive and extreme."

Paramedic Glenn Rogers, who was with Underwood when he was transported to the hospital, smelled alcohol on Underwood's breath after getting him into the ambulance. He asked if Underwood had had any alcohol and Underwood said he had had several beers. Rogers did not recall observing signs of intoxication other than the smell of alcohol. He gave Underwood two doses of fentanyl, a total of 100 micrograms, which he described as a "moderate" dose; he did not give a "significant" dose due to concern about increased sedative effects caused by alcohol in his system. Underwood was complaining of severe pain associated with bruising on his chest and the fentanyl did not appear to relieve any of his pain. Underwood was alert, oriented, cooperative and answered questions appropriately. Rogers did not note any impairments such as slurred speech or lack of coordination in his report and would have done so if he had observed them. He did not recall or note in his report any changes in Underwood's orientation or ability to converse after he was given fentanyl.

Hospital records showed that the doctor who first assessed Underwood noted "alcohol before driving," "intoxication" and "ETOH [alcohol] on breath," all of which reflected only that alcohol was consumed, not how much or the person's level of intoxication. Underwood was alert and answered questions appropriately. Dr. James Alva, who treated Underwood in the emergency department, testified that a note saying "[p]atient appears intoxicated"

7

indicated he saw behavior or clinical signs of intoxication, as he would not write this unless he believed there was sufficient evidence it was true.[2]

## C. Discovery of Walker's Body

No one told the officers and other first responders at the scene that Walker had also been in the car. Walker's body was found the day after the crash, about 60 feet from where the car came to rest. The location was not visible from the crash site even in daylight, and it would have been extremely difficult to find Walker's body at night. He died from multiple blunt traumatic injuries to his head that were consistent with being ejected from a vehicle moving at a very high rate of speed. It appeared he had not been wearing a seat belt. In the opinion of the forensic pathologist who performed the autopsy, it was very unlikely there was a period of time in which Walker could have been resuscitated; he "had no chance."

Kyaw learned that Walker had died from Mauck and decided she had to tell the truth about who was driving, so she called CHP and said Underwood was the driver. Cameron also told the police he was not the driver when he learned that Walker had died; he testified that he never would have said he was driving if he had known.

Johnson learned of Walker's death on October 10, 2018, and was with Underwood that evening at a mutual friend's house. Underwood's friends were "grilling" him about whether he was driving, telling him he was "screwed" if he was and should "kill himself or run." In a recorded statement

---

[2] Underwood was placed in a cervical collar that had to be replaced multiple times because he removed it. The repeated removal without medical approval indicated to Dr. Alva "an illogical thought process," in this case most likely due to either behavioral issues or intoxication. Dr. Alva was not aware that Underwood had been given fentanyl. Underwood later testified that he took off the neck collar because he was extremely uncomfortable and did not think he had a neck injury.

to the police the next day, Johnson said there was an argument about who was driving, the story changing from Cameron to Blevins and back, then Underwood said he "screwed up" and "shouldn't have been driving." When Johnson asked, "what did you say," Underwood said Cameron was driving.

On October 18, 2018, Underwood called his cousin, Lani Jackson, who worked as a technician with the Alameda County Sheriff's Office; told her he had been in a car accident and there was a warrant for his arrest; and asked for her and her father to take him to turn himself in. Underwood said he had been drinking and "racing a car full of friends," that a friend was going to "take the DUI for him" but "that changed" when they learned someone had died, and that the police were looking for him and "had him on camera getting into the driver's seat at a gas station." He was "[h]ysterical," said he was "going to go away forever because he had so many DUIs," he was "drunk and driving," he had "killed his best friend" and his "daughter was in the car." As soon as they hung up, Jackson called the CHP and told the lead officer on the case what Underwood had said. An hour or two later, in a second phone call, Underwood told Jackson that he had not been driving and there was no warrant, but he wanted to hide at her father's house because the victim's family was looking for him. When she tried to convince him to turn himself in, pointing out that her work calls were randomly recorded and he had already said he was driving and on video, he said, "Why would I do that when I wasn't even the one driving."

### D. Underwood's Blood Alcohol Level

Underwood's blood was drawn by a trauma nurse at 12:33 a.m. on October 10 and tested at the hospital's clinical laboratory. As described by

9

the expert witness, Dr. Philip Sobolesky,[3] the lab uses an enzymatic method for testing ethanol levels, a fast method that measures levels of the molecule NADH (nicotinamide adenine dinucleotide), which forms from ethanol. NADH can be produced by a number of naturally occurring reactions in the body and the enzymatic testing method does not identify the source. The hospital lab tests plasma rather than whole blood.[4] Ethanol concentrations in plasma samples are about 1.14 times higher than in whole blood samples. Underwood's test results indicated a level of 0.181, which would convert to a level of 0.158 in whole blood.[5]

Underwood's blood samples were subsequently released for testing by a forensic laboratory, Central Valley Toxicology Crime Lab (CVT).[6] CVT tests

---

[3] Dr. Sobolesky, a clinical biochemist at the Santa Clara Valley Medical Center (SCVMC), testified as the People's expert on operation of the machine used by the lab to test for ethanol in blood.

[4] Whole blood is the blood in a living person's system. Plasma is the "aqueous phase on top" that results from centrifuging a whole blood sample to which an anticoagulant has been added.

[5] Asked on cross examination whether he was familiar with a statement that individuals' serum whole blood ratio varies from 1.09 to 1.35, Sobolesky said he was not. The prosecutor subsequently asked Sobolesky to convert Underwood's 0.181 level by the lowest and highest conversion rates in that range, which resulted in levels of 0.166 for the lowest conversion rate and 0.134 for the highest.

[6] Clinical labs process samples for purpose of medical treatment; forensic labs, which test samples for use in criminal trials, must follow some requirements beyond those applicable to clinical labs. Title 17 of the California Code of Regulations establishes requirements for forensic labs. (See Cal. Code Regs., tit. 17, § 1216 et seq.)
CVT is a state-approved forensic laboratory. It is not accredited. California does not require forensic labs to be accredited.

for alcohol using a gas chromatograph with dual detector, a machine that most hospital labs do not have.  In accordance with regulations governing forensic laboratories, CVT must test samples of whole blood with both preservative and anticoagulant.  CVT tested the gray tube top vial of Underwood's blood, the only vial that appeared to have both the preservative and the anticoagulant required by title 17.[7]  The blood alcohol level in a whole blood analysis was 0.147.  Expert witness Bill Posey[8] testified this result was accurate within a range from 0.139 to 0.156 and was consistent with the 0.158 whole blood conversion result from the hospital lab plasma test.

Given a hypothetical of a six-foot four-inch, 290-pound man who stopped drinking at about 10:55 p.m., crashed his vehicle at about 11:10 p.m., and was found to have 0.14 percent blood alcohol content in blood drawn at about 12:33 a.m., Posey estimated the blood alcohol level at the time of the crash would have been 0.15 to 0.16.  If the test showed a level of 0.15, the estimated level at the time of the crash would be 0.16 to 0.17.  Studies on the effects of alcohol and driving indicate that one hundred percent of the population will show "marked impairment" at a 0.15 level.  For a man of this size, it would take ten to eleven 12-ounce cans of beer to reach a 0.14 level if

---

[7] Underwood's blood had been tested previously by a person who had since left CVT and moved out of state.  The People requested that the sample be retested by a current employee who would be able to testify at trial.

[8] Posey, a forensic toxicologist and licensed medical technologist who founded CVT and at the time of trial had recently retired as its director, testified as the People's expert on analysis and determination of blood alcohol and controlled substances content and the effects of alcohol on the human body.

all were consumed in a short period of time, more if the drinks were consumed over a period of hours.

### E. Prior Incidents Involving Drinking and Driving

Underwood had five prior convictions related to driving under the influence of alcohol. At the time of each conviction, he was advised in writing and by his attorney and the court that being under the influence of alcohol impairs his ability to safely operate a motor vehicle, driving while under the influence of alcohol is extremely dangerous to human life, and if he continued to drive under the influence of alcohol and someone was killed as a result, he could be charged with murder. Each time, Underwood acknowledged his understanding of these advisements. Underwood received the same advisements, and acknowledged his understanding of them, when he applied for a new driver's license shortly after the 2008 conviction. Underwood was also told, upon each of the five convictions, that his driver's license would be suspended and that he was required to install an ignition interlock device on any car he drove.

Underwood's first arrest for driving under the influence was in 2007, when he was 20 years old; in October 2008 pleaded no contest to a "wet and reckless," a lesser included offense of DUI. He was required to complete a 30-hour, first offender DUI program, during which there was repeated discussion of the dangers of drinking and driving and the possibility of being charged with murder if someone died as a result of his drinking and driving.

While that case was pending, in February 2008, Underwood was again arrested for driving under the influence. He pleaded guilty to driving with a blood alcohol content over 0.08 percent and was required to attend a six-month course on the dangers of drunk driving. He was next arrested for driving under the influence in February 2012, pleaded guilty a few months

later and was required to complete an 18-month DUI course but did not do so. While on probation, he was again arrested for driving under the influence and pleaded guilty to driving with a blood alcohol level above 0.08 in October 2013. Finally, Underwood was arrested for drinking and driving on March 11, 2018, and pleaded guilty in August 2018. He was advised that he had to complete another 18-month DUI course but never enrolled in one.

A few months before the October 9, 2018, collision, Underwood drove 76-year-old Ronald Mauck to pick up Kyaw in San Jose. On the way back to Fremont, Underwood stopped at a liquor store and bought a tall can of Mickey's, which he kept between his legs and drank as he drove to Fremont. Mauck became concerned when Underwood started driving 100 miles per hour on the 880 freeway, changing lanes and dodging in and out of traffic. Mauck told Underwood to slow down, saying "if he gets in a wreck and hurts me, he better kill me because if he don't, I'm gonna take him apart."

## F. Defense Case

### 1. *Expert Testimony on Blood Alcohol Testing*

Janine Arvizu testified as an expert in laboratory quality assurance, standards, proficiency and testing programs, operations, method validation and quality control of chemical tests, including testing for ethanol content in serum plasma or whole blood samples. She concluded that the results of the blood testing by the SCVMC lab were not reliable because the enzymatic testing method is considered a screening tool and is suitable for use in clinical settings[9] but not for forensic purposes; the lab tested plasma rather than whole blood (as title 17 requires); and the testing procedures and chain of

---

[9] Arvizu did not evaluate the reliability of the blood alcohol test results for use in a clinical setting and noted that the CVMC testing appeared to have complied with the lab's internal clinical requirements.

custody were lacking.  The blood sample CVT tested was not suitable for a forensic alcohol test because it did not have sufficient preservative and there was no record showing that a critical piece of the testing equipment was properly calibrated, and the CVT results could not be used to confirm the SCVMC results because the two labs tested different blood samples.

Arvizu explained that to prevent microbes from changing the composition of blood samples, they must be refrigerated and must have sufficient preservative.  Bacteria in blood can cause elevated levels of ethanol and yeast can cause bacteria to form through fermentation; sufficient preservative in a blood sample prevents bacteria from growing but does not stop yeast from growing.  Arvizu testified that there is no way to tell from looking at or smelling a sample that fermentation has occurred.  In the present case, the blood samples were not refrigerated when transported from SCMVC to CVT and the manner in which they were transported raised questions about the reliability of subsequent ethanol testing. [10]

Arvizu expressed concerns about CVT's quality management systems and the lab not being accredited, as accreditation bodies impose higher

---

[10] The blood samples were transported from SCVM to CVT by motorcycle and were not refrigerated during the two-hour trip; the vials were in a paper evidence envelope on top of the CHP officer's jacket in the saddlebag of his motorcycle, the bottom of which is a few inches from the motorcycle's exhaust pipe, which gets hot.

The People's expert witnesses agreed that increased temperature can cause fermentation, which would result in an artificially high alcohol level, but neither considered this a problem in this case.  Sobolesky testified that "[g]enerally bacteria aren't in a patient's bloodstream to the degree that would interfere" and, since the tubes are vacuum sealed, they are not subject to contamination from outside sources if unopened.  Posey did not think fermentation was an issue with Underwood's sample because no visible signs or odor of fermentation were noted.

14

standards than California does.  She acknowledged that the regulations in title 17 do not require use of any specific type of test tube or amount of preservative for a reliable ethanol test.  Nor do the regulations refer to refrigeration or chain of custody requirements.  The regulations do prohibit using alcohol to clean the skin where a specimen will be collected (as was done when Underwood's blood was drawn), which Arvizu testified is important because even if the alcohol used is isopropanol, the indirect testing method can misidentify isopropanol as ethanol.[11]

## 2. *Underwood's Testimony*

Underwood testified that he was raised by his grandparents from age 12 on.  They drank frequently, and Underwood learned to cope with stress and problems with alcohol.  He started drinking when he was 16.  Despite his DUIs, he did not think he had an alcohol problem.  He knew he was not

---

[11] Underwood's skin was cleaned with isopropyl alcohol before the blood draw.  The procedure followed is to first clean the area with isopropyl alcohol or ChloraPreps (chlorhexidine and isopropyl alcohol), then let it dry before inserting the needle so as to avoid accidentally injecting any live bacteria that might remain on the skin.

The People's experts did not consider this a problem.  Sobolesky testified that there are studies showing alcohol used to clean the skin before a blood draw can affect the accuracy of the results, but the impact can be avoided by waiting a certain time after wiping the area before drawing the sample.  Although the manufacturer's package insert for the hospital's testing equipment says not to use alcohol at the draw site, Sobolesky testified this was not an issue for a clinical lab because the contribution of an alcohol wipe "is quite negligible" and "not really a factor in terms of patient care"; he acknowledged the contribution could be significant for legal purposes.

Posey testified that use of an isopropyl alcohol wipe would not affect the results of testing for ethanol because the results would show the other type of alcohol if it was present.  Even if the machine could not distinguish the two types of alcohol, the only potential significance would be for the first vial drawn and the vial CVT tested was not the first one drawn.

allowed to drive with alcohol in his system and could not explain why he continued to do so. He had not had a valid driver's license since his first conviction in 2008 and had never tried to regain his license. He had never installed an ignition interlock device despite knowing he was required to do so and driving without one was a violation of his probation.

Underwood considered himself to have a high tolerance for beer because he is a big man and had been drinking for a long time. He thought it was dangerous to drive if he was feeling the effects of alcohol, but not if he was not feeling its effects.

In October 2018, Underwood was working but was looking for a job that would fit the schedule of his daughter's daycare. He had an interview scheduled for October 10. On the evening of October 9, the group got together because Walker was getting ready to leave for a few months for a job; Underwood had texted Blevins that Walker was leaving "and let's get him fucked up." Underwood was not planning to drink as much as he might have, since his daughter was there and he had the interview the next day. He testified that he drank two tall cans of Mickey's and part of a third over the course of the evening. He did not drink any Fireball.

Underwood was on probation and knew that one of the conditions was that he does not drive with alcohol in his system, even if he was not feeling its effects. He testified that when the group wanted to go for food, he drove because he had not had as much to drink as everyone else, was not feeling any effects from the alcohol he had consumed and believed he could drive safely; he would not have driven otherwise.

Underwood testified that when he sped up to pass Blevins on the freeway, he was going between 90 and 100 miles per hour for four to five seconds; when he hit 100 miles per hour, Kyaw told him to slow down and he

16

let off the gas. He did not believe driving fast was necessarily dangerous or that someone was likely to die if he drove fast, and he did not feel he was putting anyone in danger with his driving.

After he took his foot off the accelerator, Underwood heard a noise, his car pitched to the right and he lost control of it. He did not remember the car rolling down the embankment or crashing; when came to, he did not have his glasses on, he heard Doe crying and, when he could not open the car door, he climbed out the sunroof. He was "super freaked out" and "discombobulated," scared and worried about Doe and Kyaw. He thought Walker was okay and had walked off; it never occurred to him that Walker could have been ejected from the car.

Underwood testified that he was "a little bit" worried that he could get another DUI even though he was not feeling the effects of alcohol. He asked Cameron to say he was driving because he had just worked so hard to get custody of Doe and was "finally starting" to get his life in order. He felt "pretty desperate" because he was scared of having his daughter taken away and "possible repercussions of what had happened." He acknowledged lying about who was driving to the first responders, at the hospital and to Walker's mother. When he was interacting with the first responders, Underwood was worried about Doe and trying to relay to them that she had epilepsy; she had recently been diagnosed and he did not know if the epilepsy might be triggered by the collision. He did not remember stepping into the roadway but testified he might have done so when he was trying to step around the paramedic to get to the back of the ambulance, because he could not see without his glasses. He did not tell the first responders that anyone else had been in the vehicle because Walker "didn't particularly like law enforcement" and Underwood thought Walker might have walked away to avoid having an

17

interaction with them. Underwood learned of Walker's death when Blevins called him on the evening of October 10, 2018. Underwood denied driving 100 miles per hour with a beer between his legs when he was driving with Mauck.

## II.

### *Legal Proceedings*

The first amended information filed on July 29, 2021, charged Underwood with second degree murder (Pen. Code,[12] § 187, subd. (a)) (count 1); child abuse (§ 273a, subd. (a)) (count 2); driving under the influence of alcohol (DUI) causing injury (Veh. Code, § 23153, subd. (a)) with prior convictions (Veh. Code, §§ 23560, 23566) (count 3); with special allegations that he was driving at least 30 miles per hour over the maximum speed limit (Veh. Code, § 23103), proximately caused bodily injury and death to more than one victim (Veh. Code, § 23558) and had a passenger under the age of 14; driving with over 0.08 percent blood alcohol level causing injury (Veh. Code, § 23153, subd. (b)) with prior convictions (Veh. Code, §§ 23560, 23566), with the same special allegations as in count 3 (count 4); misdemeanor driving with a suspended license for a prior DUI (Veh. Code, § 14601.2, subd. (a)) (count 5); misdemeanor unlawful operation of a vehicle without a functioning ignition interlock device (Veh. Code, § 23247, subd. (e)) (count 6); and two infractions, driving at a speed exceeding 100 miles per hour (Veh. Code, § 22348, subd. (b)) (count 7) and driving with a blood alcohol

---

[12] Further undesignated statutory references will be to the Penal Code except as otherwise specified.

18

concentration of 0.01 percent or greater while on probation for a DUI (Veh. Code, § 23154, subd. (a)) (count 8).

The initial information, filed on February 14, 2020, had included a count of gross vehicular manslaughter while intoxicated, with a prior (§ 191.5, subd. (a)).

On November 23, 2021, a jury found Underwood guilty on all counts and found the special allegations true. On March 4, 2022, the trial court denied Underwood's motion for a new trial and imposed sentence. The court sentenced Underwood to a prison term of 15 years to life on count 1; a consecutive middle term of four years on count 2; a concurrent one-third middle term of one year on count 3, with concurrent one-year terms for each of the three victims for the Vehicle Code section 23558 enhancements, stayed pursuant to section 654, and concurrent jail terms of 60 days and 30 days, respectively, for the Vehicle Code section 23582 and 23572 enhancements; the same sentence on count 4 as on count 3, stayed pursuant to section 654; stayed six-month sentences on counts 5 and 6; and fines of $500 each on counts 7 and 8.

Underwood filed a timely notice of appeal on March 7, 2022.

## DISCUSSION

### I.

### *Refusal to Instruct on Vehicular Manslaughter*

In an argument raised primarily to preserve the issue for further review, Underwood maintains his rights to due process and a fair trial were

violated by the trial court's failure to instruct the jury on gross vehicular manslaughter as a lesser included offense of murder.

## A. Background

The People moved in limine to prohibit the defense from arguing to the jury that Underwood was only guilty of vehicular manslaughter, arguing that vehicular manslaughter may be related to but is not a lesser included offense of the charged murder. In opposition, the defense pointed out that the People had elected to dismiss the originally charged count of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), presumably "to take away Mr. Underwood's right to have instructions on the lesser-included offenses to that charge," and argued that Underwood had a right to *argue* he was guilty only of a lesser related, uncharged, offense even if he was not entitled to jury instructions on the offense.[13]

The trial court held that because gross vehicular manslaughter is not a lesser included offense within the charged murder and it could not instruct on a lesser related offense without the People's agreement, it would not "(1) instruct on gross vehicular manslaughter, (2) allow the Defense to discuss that instruction or statute, or (3) allow the Defense to say that Mr. Underwood may have committed gross vehicular manslaughter." The court stated that the defense was "free, of course, to fully argue that the People have not proven implied malice or any other element of murder. The Defense may argue that Mr. Underwood drove under the influence of alcohol,

---

[13] Underwood relied on *People v. Valentine* (2006) 143 Cal.App.4th 1383, 1388, which held that a defendant charged with robbery was not entitled to jury instructions on receiving stolen property because he was not charged with that offense but noted, "[w]e do not suggest, however, that Valentine could not argue to the jury that his culpability was as one who was in possession of stolen property but not one who committed a robbery." (*Id.* at pp. 1385, 1388.)

did something that could cause death, acted with gross negligence, and killed Mr. Walker due to that negligence. The Defense may even argue that these facts may add up to a 'different offense' but not murder." (Fn. omitted.)

## B. Governing Legal Principles

Underwood was charged with murder in violation of section 187, subdivision (a), which defines murder as "the unlawful killing of a human being . . . with malice aforethought." *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*) held that a person who kills another while driving under the influence of alcohol may be charged with second degree murder if the circumstances support a finding of implied malice. (*Id.* at pp. 294, 298–299.) This is "informally known as a *Watson* murder." (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 677 (*Wolfe*).)

"Gross vehicular manslaughter while intoxicated is the unlawful killing of a human being without malice aforethought, in the driving of a vehicle, where the driving was in violation of Section 23140, 23152, or 23153 of the Vehicle Code, and the killing was either the proximate result of the commission of an unlawful act, not amounting to a felony, and with gross negligence, or the proximate result of the commission of a lawful act that might produce death, in an unlawful manner, and with gross negligence." (§ 191.5, subd. (a).)

"When the prosecution charges a defendant with a *Watson* murder, a vehicular manslaughter charge *may be related to*, but it is *not necessarily included within*, the murder charge. (*People v. Sanchez* (2001) 24 Cal.4th 983, 990 (*Sanchez*), overruled on another point in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229.)" (*Wolfe, supra*, 20 Cal.App.5th at p. 685.) *Sanchez* held that gross vehicular manslaughter is not a lesser included offense of murder because "the statutory elements of murder do not include

21

all the elements of the lesser offense.  Gross vehicular manslaughter while intoxicated requires proof of elements that need not be proved when the charge is murder, namely, use of a vehicle and intoxication. Specifically, section 191.5 requires proof that the homicide was committed 'in the driving of a vehicle' and that the driving was in violation of specified Vehicle Code provisions prohibiting driving while intoxicated." (*Sanchez*, *supra*, 24 Cal.4th at p. 989.)  Gross vehicular manslaughter is not a lesser included offense under the statutory elements test because "[a]lthough as a factual matter, a murder may be carried out by means of a vehicle and by an intoxicated driver, in the abstract it obviously is possible to commit a murder without committing gross vehicular manslaughter while intoxicated." (*Id.,* at p. 988.)

"A trial court must instruct on all lesser included offenses supported by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 561.) Instructions on lesser *related* offenses, however, are permitted only if both parties agree.  (*People v. Jennings* (2010) 50 Cal.4th 616, 668; *People v. Birks* (1998) 19 Cal.4th 108,136–137.)  "A defendant has no right to instructions on lesser related offenses, even if he or she requests the instruction and it would have been supported by substantial evidence, because California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties." (*People v. Jennings*, *supra*, 50 Cal.4th at p. 668.)

"To determine if an offense is lesser and necessarily included in another offense for this purpose, [courts] apply either the elements test or the accusatory pleading test.  'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory

22

pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' (*People v. Reed* (2006) 38 Cal.4th 1224, 1227–1228.)" (*People v. Shockley* (2013) 58 Cal.4th 400, 404.)

### C. Analysis

#### 1. *Under Sanchez, Gross Vehicular Manslaughter Is Not a Lesser Included Offense of Murder*

Underwood takes issue with *Sanchez,* pointing out that the court took a different approach with respect to theft offenses in *People v. Ortega* (1998) 19 Cal.4th 686 (*Ortega*). The issue in *Ortega* was whether the defendant could be convicted of both robbery and theft under the rule prohibiting multiple convictions based on necessarily included offenses. (*Id.* at p. 694.) In holding he could not be convicted of both offenses, *Ortega* explained that although some forms of theft require proof of facts not required for robbery (e.g., grand theft of an automobile), "[f]ocusing upon whether a particular form of theft necessarily is included within the offense of robbery misses the point, recognized in our early case law, that the crime of theft, in one form or another, always is included within robbery." (*Sanchez, supra*, 24 Cal.4th at pp. 695–697.) As described in *Sanchez, Ortega* "emphasized a particular historical tradition—the long-standing recognition of the law that theft is a lesser included offense of robbery" and robbery is " ' " 'simply an aggravated form of theft with the additional element of force or fear.' " ' " (*Sanchez*, at p. 992, quoting *Ortega*, at p. 695.)

In distinguishing *Ortega, Sanchez* explained, "Although it generally is true that manslaughter is a lesser included offense of murder, because generally manslaughter simply involves an unlawful killing of a human being without malice, gross vehicular manslaughter while intoxicated—like assault with a deadly weapon—requires proof of *additional elements* that are not

23

included in the offense of murder or in other forms of nonvehicular manslaughter. . . . Although we recognize that historically manslaughter in general has been considered a necessarily included offense within murder, that long and settled tradition has not extended to the more recently enacted forms of vehicular manslaughter that require proof of additional elements." (*Sanchez*, *supra*, 24 Cal.4th at p. 992.)

Underwood relies heavily on Justice Kennard's dissent in *Sanchez,* which challenged the majority's "departure from its analysis in *Ortega*" and argued that, as with theft and robbery, "it is irrelevant that gross vehicular manslaughter while intoxicated has elements that distinguish it from other forms of manslaughter, because manslaughter, in whatever form it happens to occur, is a necessarily included offense of murder" (*Sanchez*, *supra*, 24 Cal.4th 983 at p. 1001, (dis. opn. of Kennard, J.).) Justice Kennard's position, of course, was considered and rejected by the *Sanchez* majority— which, as Underwood recognizes, we are bound to follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## 2. *The Expanded Accusatory Pleadings Test Is Inconsistent with Precedent*

*Sanchez,* as noted, determined that gross vehicular manslaughter is not a lesser included offense of murder under the statutory elements test. Underwood argues the result would be different under the "expanded accusatory pleading test" applied in *People v. Ortega* (2015) 240 Cal.App.4th 956, which held that "[t]he evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Id.* at p. 967.) Underwood argues that although the first amended information tracked the language of the

statute, the jury instructions required proof of driving under the influence, so that the prosecutor was required to prove the elements of gross vehicular manslaughter in order to prove murder.[14]

As Underwood recognizes, *People v. Ortega*, *supra*, 240 Cal.App.4th 956 has been criticized as contrary to California Supreme Court precedent. (*People v. Macias* (2018) 26 Cal.App.5th 957, 963; *People v. Alvarez* (2019) 32 Cal.App.5th 781, 789; *People v. Munoz* (2019) 31 Cal.App.5th 143, 156 (*Munoz*).) "The Supreme Court has indicated repeatedly . . . that when applying the accusatory pleading test to determine whether one offense is necessarily included in another, courts do not look to evidence beyond the actual pleading and its allegations regarding the purported greater offense. (See, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1160 . . . ['When applying the accusatory pleading test, "[t]he trial court need only examine the accusatory pleading" '], overruled in part in *People v. Scott* (2015) 61 Cal.4th 363, 391; accord, *People v. Smith* (2013) 57 Cal.4th 232, 244; see also *People v. Montoya* (2004) 33 Cal.4th 1031, 1036 . . . ['Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense'].) ¶ Indeed, in cases such as this one in which 'the accusatory pleading incorporates the statutory definition of the

_____

[14] Underwood's opening brief specifically states that his argument concerning the accusatory pleading test, like his argument that *Sanchez* reached the wrong conclusion, is raised to preserve the issue for further review. In his reply brief, however, he "clarifies" that his other arguments are raised for consideration on the merits because the California Supreme Court "has not yet addressed application of the expanded pleadings test in these circumstances."

charged offense without referring to the particular facts, a reviewing court *must rely on the statutory elements* to determine if there is a lesser included offense.' (*People v. Robinson* (2016) 63 Cal.4th 200, 207, italics added; see also [*People v. Shockley, supra,* 58 Cal.4th at p. 404] ['because the information . . . simply tracked [the statutory] language without providing additional factual allegations, we focus on the elements test'].)" (*Munoz, supra,* 31 Cal.App.5th at p. 156.)

Not surprisingly, the Courts of Appeal have rejected the expanded accusatory pleading test in cases directly on point, upholding trial courts' refusal to instruct on gross vehicular manslaughter as a lesser included offense of a charged *Watson* murder. (*People v. Alvarez, supra,* 32 Cal.App.5th at pp. 787–788; *Munoz, supra,* 31 Cal.App.5th at pp. 155–158.) We agree. Underwood was not entitled to jury instructions on gross vehicular manslaughter.

## II.

### *Section 192, Subdivision (b), Excludes Involuntary Manslaughter as a Lesser Included Offense of Murder*

"Generally, involuntary manslaughter is a lesser offense included within the offense of murder." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) Involuntary manslaughter is defined as "the unlawful killing of a human being without malice ¶ . . . ¶ in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).) The statutory definition, however,

further provides: "This subdivision shall not apply to acts committed in the driving of a vehicle." (§ 192, subd. (b).)

Despite this statutory exclusion, Underwood contends section 192, subdivision (b) should not be read to exclude vehicle-based involuntary manslaughter as a lesser included offense to murder because, in his view, the history of the provision shows the Legislature did not intend the exclusion to allow a prosecutor's decision to charge only murder to leave the jury with an all or nothing choice between murder and no liability. Underwood argues that excluding vehicle-based manslaughter from section 192, subdivision (b) violates his constitutional right to equal protection because defendants charged with murder based on an act of driving a vehicle are denied the benefit of lesser included offense instructions on involuntary manslaughter to which those charged with murder committed by other means are entitled.

## A. Section 192, Subdivision (b) Means What it Says

Underwood argues that the Legislature's intent, when it adopted the language of what is now the section 192, subdivision (b) exclusion, was simply to prevent dual liability for the same act under both the Penal Code and the Vehicle Code. The language was initially adopted as part of a 1941 amendment to former Vehicle Code section 500 (Stats. 1941, ch. 279, § 1, p. 1414), which then defined vehicular manslaughter. (*Watson*, *supra*, 30 Cal.3d at p. 297.) The amendment "elevate[d] the standard of culpable conduct" from negligence to *reckless disregard of, or wilful indifference to, the safety of others*." (*Ibid.*) It included a provision stating, " 'Hereafter, the provisions of the Penal Code, defining involuntary manslaughter, shall not apply to homicide caused by the driving of any vehicle.' " (*People v. Mitchell* (1946) 27 Cal.2d 678, 684. (*Mitchell*)) As Underwood points out, *Mitchell* observed that "[t]he sentence last quoted prevented dual liability under

27

section 500 of the Vehicle Code and section 192 of the Penal Code for the same conduct." (*Ibid.*)

Although the Legislature has since reorganized the relevant statutes,[15] it has maintained the separation between involuntary manslaughter (§ 192, subd. (b)) and vehicular manslaughter (§§ 192, subd. (c), 191.5, subd. (a)), including the exclusionary language in section 192, subdivision (b), and eventually further separated vehicular manslaughter while intoxicated (§ 191.5, subd. (a)) from other forms of vehicular manslaughter (§ 192, subd. (c)). Consistent with its exclusionary language, the Courts of Appeal have applied section 192, subdivision (b) in upholding trial courts' refusal to instruct on involuntary manslaughter when a defendant is charged with a *Watson* murder. (*Munoz, supra*, 31 Cal.App.5th at pp. 151, 153–154; *Wolfe, supra*, 20 Cal.App.5th at p. 686.)

---

[15] Vehicle Code section 500 was repealed in 1943 and section 193 "was amended to provide a specific penalty for involuntary manslaughter resulting from the operation of a vehicle." (*Watson, supra*, 30 Cal.3d at pp. 297–298.) Then, "[i]n 1945, subdivision 3 was added to section 192 (Stats. 1945, ch. 1006, § 1, p. 1943) to provide a separate category for vehicular manslaughter in addition to the voluntary and involuntary categories." (*Watson, supra*, 30 Cal.3d at p. 298.) "In 1983, [the Legislature] further defined vehicular manslaughter as being with or without gross negligence and with or without some form of intoxication. (Former § 192, subd. 3, as amended by Stats. 1983, ch. 937, § 1, pp. 3387–3388.)" (*People v. Bennett* (1991) 54 Cal.3d 1032, 1035.)

In 1986, the Legislature enacted section 191.5, defining the offense of gross vehicular manslaughter while intoxicated and replacing what had previously been subdivision (c)(3) of [section] 192 (vehicular manslaughter). (*People v. Bennett, supra*, 54 Cal.3d at p. 1035–1036 and fn. 2.) At the same time, the Legislature expressly stated in section 192, subdivision (c)(1), that the subdivision defines vehicular manslaughter "[e]xcept as provided in Section 191.5." (Stats. 1986, ch. 1106, § 3, p. 3881.)

28

*Munoz* explained: "Involuntary manslaughter is a lesser included offense of murder; thus, a trial court must instruct the jury on involuntary manslaughter '[i]f the evidence presents a material issue of whether a killing was committed without malice, and if there is substantial evidence the defendant committed involuntary manslaughter.' (*People v. Cook* (2006) 39 Cal.4th 566, 596.) [¶] If a defendant is charged with murder caused by driving a vehicle while intoxicated, however, a trial court cannot give an involuntary manslaughter instruction, because the alleged killing was an 'act[ ] committed in the driving of a vehicle' exempt from the involuntary manslaughter statute. (§ 192, subd. (b); see *Wolfe*, *supra*, 20 Cal.App.5th at pp. 685–686.) Thus, section 192, subdivision (b) effectively eliminates involuntary manslaughter as a lesser included offense of murder when 'committed in the driving of a vehicle.' (§ 192, subd. (b).)" (*Munoz*, *supra*, 31 Cal.App.5th at pp. 153–154.)

Underwood argues that these cases, which he describes as applying "the plain meaning of the proviso" in section 192, subdivision (b), result in harsher treatment for homicides resulting from acts of driving than for homicides resulting from other acts, since the jury is forced into an all or nothing choice between murder and acquittal. The "plain reading," he maintains, leads to "absurd results, contrary to the Legislative intent," because the proviso was intended only to prevent dual liability and there is no indication the legislature intended to treat vehicular homicides more harshly than other homicides. Underwood argues that the Legislature excluded vehicular homicide from the involuntary manslaughter statute at the same time it added vehicular manslaughter to section 192 with a less severe punishment than that for involuntary manslaughter, thus "indicating

29

an intent to exclude vehicular based homicide from involuntary manslaughter to ensure lesser punishment."[16]

Underwood is correct that the punishment originally attached to vehicular manslaughter was less severe than the punishment for involuntary manslaughter. For example, in 1943, when the punishment for vehicular involuntary manslaughter was set at not more than one year in county jail or a state prison term of not more than five years, the punishment for involuntary manslaughter was imprisonment for not more than 10 years. (*Watson, supra,* 30 Cal.3d at p. 297.) But Underwood's suggestion that the exclusion of vehicular manslaughter from the involuntary manslaughter statute reflects legislative intent to ensure lesser punishment for the former is unpersuasive in light of subsequent changes to the punishments for these offenses, throughout which the Legislature has retained the section 192 proviso. Currently, involuntary manslaughter is punishable by imprisonment for two, three or four years. (§ 193, subd. (b).) Vehicular manslaughter under section 192, subdivision (c), is subject to punishment ranging from a jail term of not more than a year to a term of four, six or ten years, depending on how it is committed.[17] Gross vehicular manslaughter

---

[16] Underwood's chronology appears to be slightly off: The exclusionary provision was first adopted in 1941; a separate penalty was attached to vehicle-based involuntary manslaughter in 1943; and vehicular manslaughter was added to section 192 in 1945. (*Watson, supra,* 30 Cal.3d at pp. 297–298.)

[17] Vehicular manslaughter under section 192, subdivision (c)(1) (gross negligence) is punishable by imprisonment in the county jail for not more than a year or in state prison for two, four or six years; vehicular manslaughter under section 192, subdivision (c)(3) (knowingly causing accident for financial gain in connection with presenting a false or fraudulent

while intoxicated under section 191.5 is punishable by imprisonment for four, six or ten years (§ 191.5, subd. (c)(1)) and, for a person such as Underwood, who has one or more prior convictions under enumerated statutes pertaining to multiple convictions for DUI offenses, is punishable by a prison term of 15 years to life (§ 191.5, subd. (d).) Clearly, the Legislature no longer views vehicular manslaughter—and particularly vehicular manslaughter while intoxicated—as subject to lesser punishment than involuntary manslaughter, and the exclusion of vehicular manslaughter from section 192, subdivision (b) cannot be seen as ensuring lesser punishment.

The absurdity that Underwood sees in what he concedes is the plain meaning of the exclusion in section 192, subdivision (b) was pointed out by Justice Kennard in her *Sanchez* dissent with respect to vehicular manslaughter as a lesser included offense of murder: "When an intoxicated driver becomes involved in a fatal accident, a prosecutor may elect to charge the driver only with murder, without also charging any form of vehicular manslaughter. Because, under the majority's holding, trial courts may not instruct on vehicular manslaughter as a lesser included offense of murder, juries in these instances will face the difficult and troubling all-or-nothing choice between a murder conviction and an acquittal. Thus, the majority's decision will deny juries 'the opportunity to consider the full range of criminal offenses established by the evidence.' (*People v. Barton* (1995) 12 Cal.4th 186, 197; see also *People v. Birks, supra,* 19 Cal.4th at p. 127.)" (*Sanchez, supra,* 24 Cal.4th at p. 1001, (dis. opn. of Kennard, J.).) This argument did

---

claim) is punishable by a prison term of four, six or 10 years. (§ 193, subd. (c).)

31

not convince the majority that vehicular manslaughter under section 191.5 should be considered a lesser included offense of murder.

While *Sanchez* did not address section 192, subdivision (b),[18] Justice Kennard's argument applies equally to the statutory exclusion of vehicle-based manslaughter from the definition of involuntary manslaughter, which also removes the possibility of a lesser offense to murder and therefore leaves the jury with a "difficult and troubling all-or-nothing choice" when the prosecutor charges only murder and not gross vehicular manslaughter. The *Sanchez* majority's implicit acceptance of this consequence of its decision makes it difficult to see the same consequence as "absurd" in the context of section 192, subdivision (b). Moreover, the Legislature has retained the section 192, subdivision (b) exclusion despite the consequence pointed out by the *Sanchez* dissent more than 20 years ago.

"To justify departing from a literal reading of a clearly worded statute, the result must be so unreasonable that the Legislature could not have intended it." (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 638.) In light of *Sanchez,* we cannot find the effect of the section 192, subdivision (b) exclusion on cases charging murder based on driving a vehicle so absurd as to justify departing from the unambiguous language of statute. " ' "[T]he power to define crimes and fix penalties is vested exclusively in the legislative branch." (*Keeler* v. *Superior Court* [(1970)] 2 Cal.3d 619, 631 . . . ; [citations].)' (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 516.)"

---

[18] The issue in that case was not, as here, what lesser included offense instructions should be offered to the jury but rather whether the defendant could be convicted of both second degree murder and gross vehicular manslaughter based on the same act—which he could not if one offense was a lesser necessarily included offense of the other. (*Sanchez*, *supra*, 24 Cal.4th at p. 988.)

(*People v. Chun* (2009) 45 Cal.4th 1172, 1183.) If the Legislature does not intend the plain language of section 192, subdivision (b) to apply when a defendant is charged with a *Watson* murder, it is for the Legislature to refine the statute.

## B. The Statutory Exclusion Does Not Violate Underwood's Equal Protection Rights[19]

" 'Equal protection of the laws means that similarly situated persons shall be treated similarly unless there is a sufficiently good reason to treat them differently.' (*People v. Castel* (2017) 12 Cal.App.5th 1321, 1326.) In evaluating an equal protection challenge, we first determine 'whether there are two groups of individuals who are " ' "similarly situated with respect to the legitimate purpose of the law" ' " but are being treated differently.' (*Ibid.*) '[I]f these threshold requirements are met, a court must next ascertain whether the Legislature has a constitutionally sufficient reason to treat the groups differently.' (*Ibid.*) As a general matter, laws 'will be upheld as long as there is any " ' "rational relationship between the disparity of treatment and some legitimate governmental purpose," ' " even if the rational basis for that law was never articulated by—or even relied on by—the Legislature.' (*Id.* at p. 1327.) However, if the law 'affects a fundamental right,' or the groups the law treats differently are 'members of a "suspect class" (such as race, national origin, gender, or illegitimacy, to name a few),' courts will

---

[19] Underwood did not request jury instructions on involuntary manslaughter and asks us to exercise our discretion to reach the equal protection issue despite any forfeiture. We do so because the issue is one of law, subject to de novo review, and might otherwise return to us as a petition for writ of habeas corpus alleging ineffective assistance of counsel. (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.) The People do not suggest we should find the issue forfeited.

subject it to heightened scrutiny. (*Id.* at p. 1327.)" (*Munoz, supra*, 31 Cal.App.5th at p. 162.)

As Underwood recognizes, the exclusion of vehicular homicides from the involuntary manslaughter statute has been upheld against equal protection challenges. (*Munoz, supra*, 31 Cal.App.5th at p. 162; *Wolfe, supra*, 20 Cal.App.5th at p. 690.) *Wolfe* held that defendants charged with a *Watson* murder are not subjected to disparate treatment with regard to instructions on involuntary murder as a lesser included offense because not *all* defendants charged with non-vehicular implied malice murder are entitled to such instructions: Since defendants are entitled to lesser included offense instructions only when there is substantial evidence to support the lesser charge, juries in some non-vehicular implied murder cases are also presented with an all-or-nothing choice between murder and acquittal. (*Wolfe*, at pp. 687–688.)[20] The court went on to determine that even overlooking this threshold failure to establish disparate treatment of similarly situated persons, there was no fundamental right at issue and there was "a rational basis for allowing prosecutors to charge DUI drivers who commit homicides solely with implied malice murder, rather than manslaughter." (*Id.* at p. 690.) *Wolfe* held that "the Legislature's charging scheme is rationally related to a legitimate governmental purpose: to appropriately punish—and

---

[20] Underwood criticizes *Wolfe* for defining the two groups of defendants it compared in a manner that allowed the court to find no disparate treatment. He argues the relevant comparison is within the group of all defendants charged with murder, where there is evidence the defendant acted without malice, between the defendants charged with murder based on an act involving driving a vehicle and those charged with murder by other means. For purposes of this discussion, we will assume the comparison groups to be as Underwood describes them.

34

also perhaps to discourage—people from engaging in the highly dangerous conduct of driving under the influence.  (See *People v. Wells* (2006) 38 Cal.4th 1078, 1086 [' "a drunk driver is not at all unlike a 'bomb,' and a mobile one at that" '].)"  (*Ibid.*)

*Munoz* "assume[d] for the sake of argument that the defendants charged with *Watson* murder are similarly situated to the defendants charged with other forms of implied malice murder, and that the law treats them differently" and, like *Wolfe*, concluded there was no basis for applying strict scrutiny.  (*Munoz, supra*, 31 Cal.App.5th at pp. 159–160, 162.)  *Munoz* held the statutes related to vehicular homicide were reasonably related to the legitimate legislative purpose of "providing a wider and more nuanced range of penalties given the ubiquity of automobiles and the resulting deaths caused by motorists."  (*Id.* at p. 162.)

*Munoz* explained that "the Legislature reasonably could distinguish unintentional homicides committed in the driving of a vehicle from other unintentional homicides.  Motor vehicles are a 'leading cause of accidental deaths' in this country.  (*Motor Vehicle Mfrs. Assn v. State Farm Mut.* (1983) 463 U.S. 29, 33.)  Our Supreme Court expressly has identified deterrence of driving under the influence of alcohol as 'a highly important governmental interest.'  (*Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1338.)  [¶]  Given the prevalence of deaths caused by motor vehicle accidents, the Legislature reasonably could conclude that the general involuntary manslaughter statute did not account sufficiently for the varying circumstances and levels of culpability (e.g., gross negligence, intoxication) arising in this all-too-common occurrence.  The Legislature thus reasonably could define separate vehicular manslaughter offenses, with a wider range of penalties than would be available under the general involuntary manslaughter statute.  (Cf. §§ 191.5,

35

subd. (c)(1), (2), 193, subds. (b), (c)(1), (2).)  The Legislature reasonably could add additional elements to the vehicular manslaughter statutes, such as 'driving a vehicle,' to distinguish them from involuntary manslaughter. Having created a specific statutory scheme directed at unintentional vehicular homicides, the Legislature also reasonably could exclude vehicular homicides from the general involuntary manslaughter statute."  (*Munoz, supra*, 31 Cal.App.5th at pp. 160–161.)

Contrary to *Munoz* and *Wolfe,* Underwood argues there is no rational basis for treating homicide involving driving more harshly than homicide by any other means.[21]  His argument focuses on the premise, discussed above, that the legislative intent behind the section 192, subdivision (b) exclusion of acts involving driving a vehicle was solely to avoid dual liability for the same act under both vehicular manslaughter statutes and the involuntary manslaughter statute, and not to punish vehicular homicides more harshly than other homicides.  The argument is no more persuasive as the basis for an equal protection challenge than as a reason to depart from the express language of section 192, subdivision (b).

The rational review standard " 'does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve.  Nor must the underlying rationale be empirically substantiated.  [(*Heller* [*v. Doe* (1993) 509 U.S. 312,] 320.)]  While the realities of the subject matter cannot be completely ignored (*id.* at p. 321), a court may engage in " 'rational speculation' " as to the justifications for the legislative choice (*id.* at p. 320). It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' ([*People v.*] *Turnage*[ (2012)

---

[21] Underwood makes no real effort to argue for application of strict scrutiny.

55 Cal.4th 62,] 74–75.)  To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity.  (*Heller*, at p. 320; see *Turnage*, at p. 75.)  If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' (*Heller*, at p. 319; see *Turnage* at p. 74.)" (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881.)

As we have discussed, whatever the Legislature's purpose in its initial adoption of the language that is now the section 192, subdivision (b) exclusion, the Legislature has maintained that exclusion throughout the development of a statutory scheme that treats vehicular manslaughter distinctly from involuntary manslaughter committed by other means.  The Legislature's choice to distinguish vehicular manslaughter from other forms of involuntary manslaughter and vehicular manslaughter while intoxicated from other forms of vehicular manslaughter, reflects its increasing concern with vehicular homicide in general and vehicular homicide while intoxicated in particular.  For example, "[w]hen the Legislature enacted section 191.5, it stated:  'The Legislature finds and declares that traffic accidents are the greatest cause of violent death in the United States and that over one-half of the ensuing fatalities are alcohol related. . . . In view of the severe threat to public safety which is posed by the intoxicated driver, there is a compelling need for more effective methods to identify and penalize those who voluntarily consume alcoholic beverages to the point of legal intoxication and thereafter operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of exerting great force and speed and causing severe damage and death.' (Stats. 1986, ch. 1106, § 1, pp. 3880–3881.)"  (*People v. Bennett, supra*, 54 Cal.3d at pp. 1038–1039.)

The Legislature "is afforded considerable latitude in defining and setting the consequences of criminal offenses." (*Johnson v. Department of Justice*, *supra*, 60 Cal.4th at p. 887.) The section 192, subdivision (b) exclusion of acts involving driving a vehicle from the offense of involuntary manslaughter is an integral part of the statutory scheme chosen by the Legislature. The fact that the statutory scheme results in an all-or-nothing choice for the jury when a prosecutor charges a defendant with a *Watson* murder and does not also charge vehicular manslaughter does not invalidate the Legislature's definition of the offenses. We join *Wolfe* and *Munoz* in concluding the Legislature's exclusion of acts involving driving a vehicle from section 192, subdivision (b) is rationally related to a legitimate legislative purpose.

## III.

### *Underwood Was Not Denied His Right to Present a Defense*

"A criminal defendant has a well-established constitutional right to have counsel present closing argument to the trier of fact. (*People v. Marshall* (1996) 13 Cal.4th 799, 854.) '[The] right is not unbounded, however; the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark.' (*Ibid.*)" (*People v. Benavides* (2005) 35 Cal.4th 69, 110.) "We review a trial court's decision to limit defense counsel closing argument for abuse of discretion." (*People v. Simon* (2016) 1 Cal.5th 98, 147.)

### A. Background

Underwood contends he was denied his constitutional right to present a defense by the trial court's ruling that counsel could not argue Underwood was guilty of gross vehicular manslaughter. As earlier described, in response to the People's in limine motion to prohibit the defense from arguing to the

38

jury that Underwood was only guilty of vehicular manslaughter, the trial court ruled that it would not "(1) instruct on gross vehicular manslaughter, (2) allow the Defense to discuss that instruction or statute, or (3) allow the Defense to say that Mr. Underwood may have committed gross vehicular manslaughter." The court explained that the defense was free to "fully argue that the People have not proven implied malice or any other element of murder," that Underwood "drove under the influence of alcohol, did something that could cause death, acted with gross negligence, and killed Mr. Walker due to that negligence," that "these facts may add up to a 'different offense' but not murder" and that Underwood's conduct "was reckless in a way that created a high risk of death or great bodily injury—in other words, that his conduct was grossly negligent—but there was no implied malice." Defense could not, however, argue "that this means [Underwood] is 'guilty only of gross vehicular manslaughter' or discuss that law or related instruction."

Later, the court reminded the parties of this ruling, noting that it felt the order had been violated during opening statements. When defense counsel sought to clarify that the court was precluding the defense from "even mention[ing]" the word "manslaughter" or "gross vehicular manslaughter," the court responded, "I can't imagine how you would say the word and . . . not violate the order. There might be some way, I am not envisioning it. . . . You can say this conduct was grossly negligent, you can say all that. But you can't say that he was—should have been charged with gross vehicle manslaughter or he committed gross vehicle manslaughter."

## B. Analysis

Underwood argues the trial court's ruling prevented him from conveying his primary defense—that he was guilty of a lesser manslaughter

39

offense but not guilty of murder. He acknowledges that defense counsel did argue that he was not guilty of murder, that there were "lesser forms of homicide that would actually be applicable to this case" and that "the Prosecution chose to charge [Underwood] with the most extreme form of homicide, murder." He maintains, however, that defense counsel "could not give legitimacy to the argument by naming the lesser crime that the evidence supported or argue the elements were a better fit."

In essence, Underwood argues that his defense depended on being able to show the jury that the elements of gross vehicular manslaughter fit the facts of his offense better than the elements of murder. But since the jury did not have the option of convicting Underwood of gross vehicular manslaughter, referring to that offense and discussing its elements would have risked confusing the jury unnecessarily.

The point of discussing gross vehicular manslaughter would have been to convince the jury that the prosecutor overstepped by choosing not to charge an offense that fit the facts better than the more serious offense actually charged. Defense counsel was able to, and did, make this point forcefully despite not naming the specific offense. Defense counsel argued, "Now when you first found out what happened in this case, you were probably a bit surprised that [Underwood] was being charged with murder and not a different form of homicide, maybe a lesser form of homicide. [¶] And you should trust your instincts when it comes to that because this, what happened here is not murder. There are other forms of homicide as you heard. There are lesser forms of homicide that would actually be applicable to this case. But the Prosecution chose to charge [Underwood] with the most extreme form of homicide, murder." At another point, defense counsel argued that "[t]his was stupid, reckless behavior plain and simple" but was stopped

40

by a sustained objection when he began to say, "vehicular recklessness that leads to a death is a different—" Counsel then continued, "The Prosecution could have charged Mr. Underwood with something else if they wanted to do this fairly. Instead they chose to pursue the most extreme charge which must be reserved for only the most extreme conduct." Defense counsel told the jury that "[c]onvicting [Underwood] of something so extreme when the evidence does not support that would be a grave and irreversible injustice. [Underwood] bears responsibility but he is not guilty of murder."

Underwood quotes a portion of closing argument in which defense counsel, after arguing that Walker's death was a tragedy but did not involve the "conscious decision-making" necessary for murder, stated that "[t]his was stupid, reckless behavior plain and simple" but was stopped by a sustained objection when he began to say "vehicular recklessness that leads to a death is a different—" Underwood acknowledges that his counsel then argued he was not guilty of murder but of "something less" but complains that counsel could not identify the lesser offense. He then points to several questions the jury asked during deliberations seeking clarification of instructions regarding implied malice and suggesting it was having difficulty reaching a verdict on one (unidentified) count.[22] To the extent Underwood is arguing that the

---

[22] The jury asked for "[c]larification on 'A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes' from pg 31 in the form of definition and examples"; "[c]larification on pg 30 Implied Malice #3 'At the time he acted, he knew his act was dangerous to human life' in terms of interpretation of 'knew' "; and "[c]larification or understanding of standard for pg 30, Implied Malice #4 'He deliberately acted with conscious disregard for human life.' " The jury also asked the court "[w]hat happens if we can't agree on one of the counts? Is the one charge dismissed and the others still hold?"

41

inability to expressly refer to gross vehicular manslaughter interfered with his ability to argue he lacked implied malice, we are again unpersuaded.

Defense counsel repeatedly stressed that Underwood acted recklessly but without the mental state of implied malice necessary for murder. As Underwood points out, defense counsel's closing argument in effect focused on Underwood's mental state by conceding much of his culpable conduct, including his prior DUI convictions, his decisions to drive after drinking (although not while feeling the effects of alcohol), with a suspended license, without a required ignition interlock, well over the speed limit, with his daughter in the car and his attempts to avoid responsibility by lying to the police and Walker's family. Counsel's fundamental point was that Underwood did not intend or want to put anyone in danger or kill anyone: Counsel argued that Underwood's conduct "was poor judgment but it was not implied malice. This was recklessness, yes, but it was not murder." Counsel argued that convicting Underwood of murder "when the evidence does not support a charge that extreme is not true, proper accountability."

Specific reference to gross vehicular manslaughter would not have assisted defense counsel in explaining the concept of implied malice; it would simply have allowed counsel to name an offense the People could have charged rather than refer generally to charges not requiring implied malice.

---

The court responded that it could not "give further instructions with additional definitions, examples, or explanations" but suggested that it "may (or may not) be helpful to read the instructions for Count 1 with the 'act' in mind" and provided a copy of the instructions pertaining to count 1 on which "driving under the influence" was substituted for each instance of "act." The court further stated that if the jurors were unable to agree on count 1, "we can discuss whether short, further arguments by counsel about implied malice would be helpful." The jury subsequently returned its verdicts without additional argument.

42

As shown in the portions of closing argument we have quoted, defense counsel was fully able to make the point that the evidence showed Underwood's poor judgment and reckless conduct but not that he knew his act of driving under the influence was "dangerous to human life" and "deliberately acted with conscious disregard for [human] life." (CALCRIM No. 520 [defining implied malice].)

Underwood "was not precluded from making his central argument" by the trial court's ruling. (*People v. Simon*, *supra*, 1 Cal.5th at p. 147.) Accordingly, we find no abuse of discretion. (*Ibid.*)

### IV.

### *Several Sentence Enhancements Must Be Stricken*

**A. The Two Vehicle Code Section 23572 Enhancements Are Not Statutorily Authorized**

In connection with counts 3 and 4, the jury found true the allegations that Underwood had a passenger under the age of 14. The trial court imposed a concurrent term of 30 days in county jail for the enhancement on count 3 and the same punishment on count 4, stayed pursuant to section 654.

Vehicle Code section 23572 specifies additional penalties to be imposed on a person convicted of a violation of Vehicle Code section 23152 when a minor under 14 years of age was a passenger in the vehicle at the time of the offense. Counts 3 and 4 charged Underwood with violations of Vehicle Code section *23153*, not section 23152. Accordingly, Underwood contends these two enhancements must be stricken. He also points out that even if Vehicle Code section 23572 applied to convictions of violating Vehicle Code section 23153, the enhancements would not apply to him because Vehicle Code section 23572, subdivision (c), specifies that "[n]o punishment enhancement shall be imposed pursuant to this section if the person is also

43

convicted of a violation of Section 273a of the Penal Code arising out of the same facts and incident." Underwood was convicted of child abuse in violation of section 273a, subdivision (a), in count 2.

The People agree that these enhancements must be stricken. We concur.

## B. Two of the Vehicle Code Section 23558 Enhancements Are Not Statutorily Authorized

On counts 3 and 4, Underwood was convicted of driving under the influence of alcohol causing injury to Walker, Kyaw and Underwood's daughter (Veh. Code, § 23153, subd. (a)) and driving with over 0.08 percent blood alcohol level causing injury to the same three victims (Veh. Code, § 23153, subd. (b)). In connection with both counts, the jury found true allegations that Underwood caused bodily injury and death to the three victims. The trial court imposed one-year terms for each of the three victims pursuant to Vehicle Code section 23558.[23]

Vehicle Code section 23558 provides that a person who proximately causes bodily injury or death "to more than one victim in any one instance of driving in violation of Section 23153 of this code" shall receive a one-year enhancement "for *each additional* injured victim." (Italics added.) Underwood argues the language of Vehicle Code section 23558 requires that enhancements be imposed only for additional injured victims beyond the first. The People agree, as do we. Underwood may be sentenced to only two Vehicle Code section 23558 enhancements, not three.

---

[23] On count 3, the court imposed the enhancements as to Kyaw and Underwood's daughter to run concurrently and stayed the enhancement as to Walker pursuant to Penal Code section 654; the court stayed the enhancements on count 4 pursuant to Penal Code section 654.

## DISPOSITION

On each of counts 3 and 4, the enhancements under Vehicle Code section 23572 and corresponding punishment shall be stricken.

On each of counts 3 and 4, one of the Vehicle Code section 23558 enhancements and the corresponding one-year prison term for each of these enhancements shall be stricken.

The abstract of judgment shall be corrected accordingly.

In all other respects, the judgment is affirmed.

                                    _____

                                    STEWART, P. J.

WE CONCUR:

_____

RICHMAN, J.

_____

MILLER, J.

*People v. Underwood* (A165026)